UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>                    Plaintiff,<br><br>        v.<br><br>MILFORD STONE COMPANY, INC.,<br><br>                    Defendant. | Case No. 19-cv-12449<br><br>**COMPLAINT** |

## INTRODUCTION

1.      Defendant Milford Stone Company, Inc. ("Milford Stone") operates a sand and gravel mining and processing facility ("Facility") at 429 East Main Street in Milford, Massachusetts. The Facility is located on approximately 20 to 30 acres of mostly deforested land covered by exposed sediment such as sand and gravel. The land is adjacent to a series of wetlands connected to headwaters of the Charles River. The wetlands are within an area designated by the Commonwealth as "Core Habitat" essential to ensuring the long-term persistence of plant and animal species of conservation concern.

2.      The company discharges polluted stormwater into a municipal catch basin on East Main Street that empties into wetlands southeast of the Facility (the "Southeast Wetlands"), wetlands that bisect the Facility (the "Middle Wetlands"), and wetlands northwest of the Facility (the "Northwest Wetlands"). These wetlands are collectively referred to herein as the "Wetlands."

3.      Milford Stone's stormwater contains pollutants, including sediment. Sediment consists of loose sand, clay, gravel, silt, or other material that mixes in the water column and settles at the bottom of a body of water. Sedimentation severely harms the health of wetlands by, among

other things, reducing wetland volume, decreasing the wetlands' ability to retain water, and changing the structure of plant and animal communities in the wetlands.

4.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the federal Clean Water Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"), the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40, and the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26-53. The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Milford Stone's illegal discharges of pollution.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

6.      On November 6, 2018, the Commonwealth provided notice of Milford Stone's violations of the Clean Water Act, and of its intention to file suit against Milford Stone (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Milford Stone, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

7.      More than sixty days have passed since notice was served.

8.      This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this complaint.

2

9.      The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Milford Stone's failure to comply with environmental laws, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Milford Stone's activities. Milford Stone's continuing commission of the acts and omissions alleged in this Complaint will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

10.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

11.     Plaintiff is the Commonwealth, appearing by and through the Attorney General.

12.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

13.     Defendant Milford Stone is a domestic corporation that operates a sand and gravel mining and processing facility at 429 East Main Street, Milford, Massachusetts.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

14.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the Federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

15.     Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water and destroys aquatic habitat, making it difficult or impossible for many existing species in the water to grow, and increasing the presence of nuisance species. Excess nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create health hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

16.     Impacts from stormwater pollution, including sediment and other pollutants, pose particular risks to wetlands. Wetlands are among the most productive ecosystems in the world, comparable to rain forests and coral reefs. Wetlands play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects. Many species of birds and mammals

4

rely on wetlands for food, water, and shelter, especially during migration and breeding. The holding capacity of wetlands also prevents floods and erosion. Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater, and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distribute them more slowly over the floodplain. Wetlands store carbon within their plant communities and soil instead of releasing it to the atmosphere as carbon dioxide. Thus, wetlands help to moderate global climate conditions. Stormwater contaminated with sediment can harm wetlands by, among other things, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and water quality and significantly increase the risk of flooding.

17.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

18.     Sand and gravel mining and processing facilities that discharge industrial stormwater to waters of the United States directly or through separate storm sewer systems are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-3.

19.     The Stormwater Permit requires these facilities to, among other things:

        a.      prepare a stormwater pollution prevention plan ("SWPPP") that, among
                other things, describes the facility and identifies all stormwater outfalls,
                Stormwater Permit, pg. 31;

5

b.      submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

c.      ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

d.      locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

e.      minimize erosion by stabilizing exposed soils at the facility and use structural and non-structural control measures to minimize the discharge of sediment, Stormwater Permit, pg. 17;

f.      evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater Permit, pg. 19;

g.      ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 20;

h.      implement specific best management practices applicable to sand and gravel mining and processing facilities, Stormwater Permit, pgs. 105-109;

i.      monitor stormwater discharges from all outfalls for compliance with benchmarks applicable to sand and gravel mining and processing facilities, Stormwater Permit, pg. 113;

j.      report all monitoring results for all facility outfalls to EPA by specified deadlines, Stormwater Permit, pgs. 48-49;

6

k.      conduct corrective action to expeditiously eliminate excessive stormwater pollution and unauthorized non-stormwater discharges, Stormwater Permit, pgs. 27-29;

l.      conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, Stormwater Permit, pgs. 22-26;

m.      timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, pgs. 49-50; and

n.      comply with any additional Massachusetts requirements, including but not limited to the requirements of the Massachusetts Clean Waters Act and the Massachusetts Wetlands Protection Act and their implementing regulations. Stormwater Permit, pg. 170.

*Citizen Suit Provision of the Federal Clean Water Act*

20.      Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

7

21.     The Commonwealth is a "citizen" within the meaning of Section 505 of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C. § 1365(g).

22.     Under Section 505 of the CWA, this Court has authority to enjoin violations of the Stormwater Permit and to impose penalties of up to $54,833 per day for each of violation. *See* Sections 505(a) and 309(d) of the CWA, 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. §§ 19.1 – 19.4; 83 Fed. Reg. 2058 (Feb. 5, 2019).[1]

## State Environmental Requirements

### *Wetlands Protection Act*

23.     The Wetlands Protection Act, G.L. c. 131, § 40, and its implementing regulations, 310 C.M.R. §§ 10.00 et seq. ("Wetlands Regulations"), establish a comprehensive regulatory scheme to prevent damage to the Commonwealth's wetlands resource areas and to compel restoration of wetland resources that are illegally altered or filled.

24.     The Wetlands Protection Act and the Wetlands Regulations limit activities in various defined wetlands resource areas, including Banks (Inland), Bordering Vegetated Wetlands, Land Under Water Bodies and Waterways, and Riverfront Areas (collectively "Resource Areas"). G.L. c. 131 § 40; 310 C.M.R. §§ 10.02, 10.04. Resource Areas serve many important functions, including protecting water quality, reducing flood and storm damage, preventing pollution, and protecting fisheries and wildlife habitat. 310 C.M.R. §§ 10.54(1); 10.55(1); 10.56(1); 10.58(1). Improper alteration of land under rivers can harm fish and other aquatic animals by destroying habitat for the smaller aquatic organisms at the bottom of the food chain and by reducing the

---

[1] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

circulation of oxygen in the water column. The alteration of Bank (Inland)s, Bordering Vegetated

Wetlands, and Riverfront Areas can harm water quality by reducing the filtering of sediments,

toxic substances (such as heavy metals), and nutrients (such as phosphorus and nitrogen) from

stormwater.

25.     Accordingly, anyone who plans to conduct activities that may compromise a

Resource Area must notify, and obtain authorization from, the local Conservation Commission or

MassDEP before commencing the activities. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a);

10.05(4)(a). It is also a violation to leave in place unauthorized fill, or otherwise fail to restore an

illegally altered Resource Area to its original condition. G.L. c. 131, § 40; 310 C.M.R. §§ 10.54(4);

10.56(4); 10.58(4).

26.     Under G.L. c. 131, § 40, a court may enjoin violations of the Wetlands Protection

Act and may enter such orders as it deems necessary to remedy the violations, including orders to

restore the altered Resource Area to its original condition.

27.     Pursuant to G.L. c. 131, § 40, any person who violates the Wetlands Protection Act

or the Wetlands Regulations shall be subject to a civil penalty of up to $25,000 for each violation,

with each day such violation occurs or continues constituting a separate violation.

28.     The Attorney General has authority to enforce the Wetlands Protection Act and its

implementing regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

*Clean Waters Act*

29.     The Massachusetts Clean Waters Act, G.L. c. 21, §§ 26–53 is intended "to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution." G.L. c. 21, § 27.

30.     Pursuant to G.L. c. 21, § 27(12), Mass DEP has adopted rules and regulations to protect the quality and value of water resources in Massachusetts. These regulations are published at 314 C.M.R. §§ 2.00–18.00.

31.     The Clean Waters Act prohibits certain discharges of pollutants, including but not limited to industrial materials and industrial runoff, without a state issued discharge permit. M.G.L. c. 21, § 43; 314 CMR §§ 3.03(1), 3.02. The Clean Waters Act also prohibits persons from engaging in activities that may reasonably result, directly or indirectly, in discharge of pollutants into waters of the Commonwealth without a state issued permit unless exempted by certain provisions not applicable here. M.G.L. c. 21, § 43(2); 314 C.M.R. § 3.04(1).

32.     G.L. c. 21, § 46 authorizes injunctions for violations of G.L. c. 21.

33.     Pursuant to G.L. c. 21, § 42, any person who violates the Massachusetts Clean Waters Act or its regulations shall be subject to a civil penalty of up to $50,000 for each violation, with each day such violation occurs or continues constituting a separate violation.

34.     The Attorney General has authority to enforce the Clean Waters Act and its implementing regulations pursuant to state law. *See* G.L. c. 12, §§ 3 and 11D.

## STATEMENT OF FACTS

### Description of the Milford Stone Facility & Activities

35.     The Facility is located on approximately 20 to 30 acres of mostly deforested land covered by exposed sediment such as sand and gravel ("Surface Sediment"). As shown in Figure A

below, the most active portion of the Facility is shaped like two wings that are referred to herein as

the "Upper Wing" and the "Lower Wing." The Middle Wetlands is located between these two

wings. The Northwest Wetland and Southeast Wetland flank the outside of the Upper and Lower

Wings of the Facility respectively.

FIGURE A



Taken from MassDEP Online Map Viewer, Wetland and Wetland Change Areas Map, on September 19,
2018. Yellow line marks approximate boundary of active portion of Facility (added by Attorney General's
Office). Green lines mark approximate boundary of wetlands (in the original)
symbol marks approximate location of Certified Vernal Pool (in the original)

36.     The Wetlands are connected to headwaters of the Charles River, which flows 80

miles from Hopkinton to Boston Harbor. The Charles River is the most prominent urban river in

New England, and a major source of recreation and connection to the natural world for residents of

eastern Massachusetts. Downstream areas of the Charles River are impaired by excessive pollution

due to stormwater runoff, sewage, and industrial wastewater. The many acres of undeveloped

11

wetlands within the Charles River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, for preventing downstream flooding, and by providing natural habitats to native species.

37.     The Wetlands are within an area designated by the Commonwealth as "Core Habitat" critical for the long-term persistence of rare species and other species of conservation concern. According to the Massachusetts Department of Fish & Game, protection of Core Habitat "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts."[2]

38.     The Northwest Wetlands and Middle Wetlands are hydrologically connected to Deer Brook, which flows northeast to Weston Pond.

39.     The Southeast Wetlands are hydrologically connected to Hopping Brook, which runs southeast to the Charles River.

40.     Milford Stone mines and processes material into various products including different sizes of stone, washed sand, rip rap, and gravel.

41.     Milford Stone stores raw material and finished material ("Industrial Material")[3] in outdoor piles located at various locations at the Facility.

42.     Milford Stone moves Industrial Material around the Facility using trucks, tractors, and other heavy equipment ("Equipment").

43.     Milford Stone's Industrial Material is sediment-laden.

---

[2] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

[3] The definitions of "Surface Sediment" and "Industrial Materials" may, in some instances, overlap, since (1) both substances may have similar properties, and (2) Industrial Materials may fall to the ground and mix with Surface Sediment.

44.     Surface Sediment, Industrial Material, and pollutants that are present in or adhere to Surface Sediment and Industrial Material (collectively, "Pollutants") become mobilized by Equipment at the Facility and are tracked around and off the Facility by Equipment.

45.     Sediment from the Facility is present on East Main Street in a path leading from the Facility's driveways. *See* Attachment A.

46.     The high point of the Lower Wing is significantly higher in elevation than the Southeast Wetlands and the Middle Wetlands.

47.     The southeast portion of the Lower Wing pitches sharply down towards East Main Street and the Southeast Wetlands. *See* Attachment B.

48.     The high point of the southeast portion of the Upper Wing is significantly higher in elevation than the Middle Wetlands. *See* Attachment C.

49.     The high point of the northwest portion of the Upper Wing is significantly higher in elevation than the Northwest Wetlands. *See* Attachment D.

## Milford Stone's Discharge of Pollutants from the Facility

### *Sediment Discharges to the Resource Areas in and Around the Facility*

50.     Milford Stone's activities and its movement of Industrial Material and ground cover around the Facility has resulted in and continues to result in the discharge of Industrial Material to Resource Areas, including but not limited to the Wetlands, to a creek that bisects the Facility, and banks of the creek that bisects the Facility.

51.     Industrial Material and other sediment from the Facility is present in the Wetlands, the creek that bisects the Facility, and the banks of the creek that bisects the Facility.

*Polluted Stormwater Discharges to the Wetlands*

52.     Industrial Material and Surface Sediment at the Facility are exposed to precipitation.

53.     Pollutants become mobilized by stormwater.

54.     Since at least December 1, 2014, during the rain events listed on Attachment E, Milford Stone has discharged polluted stormwater off of the Facility from several locations, including but not limited to:

> a.     off the Lower Wing of the Facility and southeast to the Facility driveway and into a municipal catch basin on East Main Street that leads to the Southeast Wetlands (*see* Attachment A);
>
> b.     off the Lower Wing of the Facility and northwest to the Middle Wetlands (*see* Attachment B);
>
> c.     off of the Upper Wing of the Facility and southeast into the Middle Wetlands (*see* Attachment C); and
>
> d.     off of the Upper Wing of the Facility and northwest to the Northwest Wetlands (*see* Attachment D).

55.     Pollutants at the Facility adhere to and are tracked off of the Facility and onto East Main Street by Equipment (for example, tires and treads). Pollutants from the Facility that are tracked onto East Main Street by Equipment are picked up in stormwater and discharged into the Southeast Wetlands via the East Main Street catch basin.

*Milford Stone's Failure to Comply*
*with Federal Stormwater Requirements*

56.     Milford Stone has not submitted a Notice of Intent to be covered by the Stormwater Permit.

57.     Milford Stone has not complied with the terms of the Stormwater Permit.

## FIRST CAUSE OF ACTION
### Discharges of Industrial Stormwater Without a Federal Stormwater Permit: Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

58.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

59.     Milford Stone is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

60.     The Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

61.     Every day since December 1, 2014 to the present that Milford Stone discharged polluted stormwater from the Facility to Wetlands without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505 (a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

62.     These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## SECOND CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

63.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

64.     Since at the latest, December 1, 2014, Milford Stone has violated the Stormwater Permit by failing to:

   a.     prepare a SWPPP that, among other things, includes the location of all stormwater outfalls in the SWPPP (violation of section 5.2);

   b.     submit a "complete and accurate NOI" (violation of section 1.2.1);

   c.     ensure that pollutant control measures minimize pollutants in its stormwater discharges (violation of section 2.1);

   d.     locate materials, equipment, and activities to contain potential spills (violation of section 2.1.2.1);

   e.     minimize erosion by stabilizing exposed soils at the facility and use structural and non-structural control measures to minimize the discharge of sediment (violation of section 2.1.2.5);

   f.     evaluate for the presence of and eliminate all non-stormwater discharges at the Facility (violation of section 2.1.2.9);

   g.     ensure that stormwater discharges do not cause or contribute to a violation of water quality standards (violation of section 2.2.1);

   h.     implement specific best management practices applicable to sand and gravel mining and processing facilities (violation of section 8.J.8);

   i.     monitor stormwater discharges from all outfalls for compliance with

16

EPA's benchmark limits (violation of section 6.1.1);

j.    report to EPA monitoring results for all outfalls (violation of Section 7.4);

k.    take corrective action to eliminate non-stormwater discharges and address excessive sedimentation (violation of section 4.1);

l.    conduct routine and quarterly facility inspections to ensure, among other things, that control measures are functioning correctly and are adequate to minimize pollutant discharges (violation of sections 3.1 and 3.2);

m.    timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (violation of section 7.5); and

n.    comply with additional state requirements incorporated by reference into the Permit, including the Massachusetts Clean Waters Act (violation of section 9.1.2.1).

65.    Each of Milford Stone's violations of the requirement of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

66.    These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

### THIRD CAUSE OF ACTION
### Violations of the Massachusetts Wetlands Protection Act and the Wetlands Regulations: G.L. c. 131, § 40; 310 C.M.R. § 10.00

67.    The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

68.     The Wetlands Protection Act and its implementing regulations provide, with exceptions not relevant here, that no person shall remove, fill, dredge, or alter areas subject to that Act's protection, or cause, suffer, or allow such activity, without first filing a Notice of Intent with the appropriate local Conservation Commission and obtaining an Order of Conditions from the Conservation Commission or a Superseding or Final Order of Conditions from the Department permitting the activity. *See* G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a).

69.     Areas subject to the protection of the Wetlands Protection Act and the Wetlands Regulations include bordering vegetated wetlands. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(1), 10.54(2), 10.55(2), 10.56(2), 10.58(2).

70.     The Wetlands Protection Act defines "person" to "include any individual, group of individuals, . . . partnership, . . . company, . . . or any other legal entity or its legal representative, agents or assigns." G.L. c. 131, § 40.

71.     Pursuant to 310 C.M.R. § 10.04, "fill" means "to deposit any material so as to raise an elevation, either temporarily or permanently."

72.     Pursuant to 310 C.M.R. § 10.04, "alter" means "to change the condition of" any area subject to the protection of the Wetlands Protection Act, including, without limitation, "the changing of pre-existing drainage characteristics, . . . sedimentation patterns, flow patterns and flood retention areas," and "the destruction of vegetation."

73.     Milford Stone is a "person" within the meaning of G.L. c. 131, § 40, and 310 C.M.R. §§ 10.00 et seq.

74.     The Wetlands on the Facility are "Bordering Vegetated Wetlands," as defined in the Wetlands Regulations. 310 C.M.R.  § 10.55(2).

75.     By discharging Industrial Materials into the Wetlands, Milford Stone has altered or filled an area subject to the protection of the Wetlands Protection Act and the Wetlands Regulations.

76.     Milford Stone's alteration or filling of the Wetlands was not authorized by any Order of Conditions or Superceding Order of Conditions.

77.     By altering or filling the Wetlands without an Order of Conditions from the Milford Conservation Commission or Superseding Order of Conditions from Mass DEP, Milford Stone has violated the Wetlands Protection Act and the Wetland Regulations. G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a), 10.08(1)(c).

78.     By allowing the unauthorized fill to remain in place in the Wetlands, Milford Stone vioated and continues to violate G.L. c. 131, § 40 and 310 C.M.R. § 10.02(a).

79.     Each of Lane's violations of the Wetlands Protection Act and its implementing regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

## FOURTH CAUSE OF ACTION
### Violations of the Massachusetts Clean Waters Act:
### G.L. c. 21, § 43(2); 314 C.M.R. § 3.00

80.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

81.     The Massachusetts Clean Waters Act and its implementing regulations provide, with exceptions not relevant here, that no person shall discharge pollutants into waters of the Commonwealth without a state issued pollutant discharge permit. *See* G.L. c. 21, § 43(2); 314 C.M.R. § 3.03.

19

82.     G.L. c. 21, § 26 and the regulations at 314 C.M.R. § 3.02 define "person" to mean, *inter alia*, any "public or private corporation or authority, individual, partnership or association, or other entity."

83.     The regulations at 314 C.M.R. § 3.02 define "discharge" as "any addition of any pollutant or combination of pollutants to waters of the Commonwealth from any source …."

84.     The regulations at 314 C.M.R. § 3.02 define "pollutant" as "any element or property of … industrial … waste, runoff … or other matter, in whatever form pand whether originating at a point source or major non-point source, which is or may be discharged, drained or otherwise introduced into … waters of the Commonwealth."

85.     The regulations at 314 C.M.R. § 3.02 define "Waters of the Commonwealth" as "all waters within the jurisdiction of the Commonwealth including, without limitation, rivers, streams, lakes, ponds . . . wetlands, coastal waters, and ground waters."

86.     Milford Stone is a "person" within the meaning of G.L. c. 21, § 26 and 314 C.M.R. § 3.02.

87.     Milford Stone's Industrial Material is a "pollutant" within the meaning of 314 C.M.R. § 3.02.

88.     Sediment in runoff from the from Milford Stone's Facility is a "pollutant" within the meaning of 314 C.M.R. § 3.02.

89.     Milford Stone's discharge of Industrial Material to wetlands and waterways on and adjacent to the Facility is a "discharge" of a "pollutant" within the meaning of 314 C.M.R. § 3.02.

90.     The Wetlands and their associated streams are a "Water[s] of the Commonwealth" within the meaning of 314 .M.R. § 3.02.

91.     By discharging Industrial Materials into the wetlands, Milford Stone violated G.L. c. 26, § 43(2) and 314 C.M.R. § 3.03(1).

92.     By storing Industrial Materials immediately above the banks of the Housatonic River in piles from which material is capable of spilling off towards the River, Lane has engaged in an activity that may reasonably result, directly or indirectly, in the discharge of pollutants to waters of the Commonwealth without a permit in violation of G.L. c. 21, § 43(2) and 314 C.M.R. § 3.04(1).

93.     Milford Stone is not exempt by 314 C.M.R. § 3.05 for any of these violations.

94.     Each of Milford Stone's violations of the Clean Waters Act and its implementing regulations is a separate and distinct violation for each day on which the violation occurred and/or continued.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.     Require Milford Stone to comply with EPA's federal Stormwater Permit;

2.     Order Milford Stone to pay civil penalties of up to

   a.   civil penalties of up to $37,500 per day for each violation of the Federal Clean Water Act that occurred on or before November 2, 2015, and civil penalties of up to $54,833 per day for each violation of the CWA that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a), 40 CFR § 19.4, and 84 Fed. Reg. 2058 (Feb. 6, 2019);

     b.  $25,000 for each day of each violation of the Wetlands Protection Act, G.L. c. 131, § 40, to the Commonwealth; and

     c.  $50,000 for each day of each violation of the Clean Waters Act, G.L. c. 21, §§ 26-53, to the Commonwealth.

3.    Order Milford Stone to take appropriate actions to restore the quality of protected areas impaired by its activities;

4.    Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.    Award any such other and further relief as this Court may deem appropriate.

Dated:

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Nora J. Chorover*_____
Nora J. Chorover (Bar No. 547352)
Special Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2200, ext. 2436
Nora.Chorover@mass.gov